[ORAL ARGUMENT SCHEDULED FOR OCTOBER 26, 2026]

**No. 26-5244**

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

IN RE: SEALED CASE

APPEAL FROM ORDER DENYING MOTION TO QUASH GRAND JURY SUBPOENA IN CASE NO. 1:26-GJ-00022-JEB IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

# BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF THE DISTRICT OF COLUMBIA, ELECTRONIC FRONTIER FOUNDATION, CENTER FOR INDIVIDUAL RIGHTS, FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, CATO INSTITUTE, AND NETCHOICE IN SUPPORT OF APPELLANT

F. Mario Trujillo
Aaron Mackey
David Greene
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
mario@eff.org
amackey@eff.org
davidg@eff.org

Laura K. Follansbee
Michael Perloff
Scott Michelman
Arthur B. Spitzer
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF THE DISTRICT OF COLUMBIA
529 14th Street NW, Ste 420
Washington, D.C. 20045
(202) 457-0800
lfollansbee@acludc.org
mperloff@acludc.org
smichelman@acludc.org
aspitzer@acludc.org

Laura Moraff
Nathan Freed Wessler
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
lauramoraff@aclu.org
nwessler@aclu.org

*(Additional Counsel for Amici listed on following page)*

Michael A. Petrino
CENTER FOR
INDIVIDUAL RIGHTS
1100 Connecticut Ave., NW
Suite 625
Washington, DC 20036
(202) 833-8400
petrino@cir-usa.org

Matthew P. Cavedon
CATO INSTITUTE
1000 Mass. Ave., NW
Washington, DC 20001
(706) 309-2859,
mcavedon@cato.org

Ronald G. London
FOUNDATION FOR
INDIVIDUAL
RIGHTS AND
EXPRESSION
700 Pennsylvania Ave. SE,
Ste. 340
Washington, DC 20003
(215) 717-3473
ronnie.london@fire.org

Cody Venzke
AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION
915 15th St. NW
Washington, DC
20005
(202) 715-0816
cvenzke@aclu.org

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES AND RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1(a) and 29(a)(4)(A) and D.C. Circuit Rule 28(a)(1), undersigned counsel certifies as follows:

A. **Parties and *Amici***

Counsel for *amici* assume that all parties and *amici* appearing before the district court and this Court are listed in the Brief for Appellant except for *amici curiae* American Civil Liberties Union, American Civil Liberties Union of the District of Columbia, Electronic Frontier Foundation, Center for Individual Rights, Foundation for Individual Rights and Expression, Cato Institute, and NetChoice, which file this brief in support of Appellant.

**B. Rulings Under Review**

Counsel for *amici* assume that references to the rulings at issue appear in the Brief for Appellant.

**C. Related Cases**

Undersigned counsel is not aware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

**D. Corporate Disclosure Statement**

Pursuant to Fed. R. App. P. 26.1 and Circuit Rule 26.1, *Amici curiae* American Civil Liberties Union, American Civil Liberties Union of the District of Columbia, Electronic Frontier Foundation, Center for Individual Rights, Foundation for

Individual Rights and Expression, Cato Institute, and NetChoice state that they do not have a parent corporation and that no publicly held corporation owns 10% or more of their stock. More information about each organization is available in the statement of interest.

Dated: September 2, 2026 *<u>/s/ Laura Moraff</u>*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........ ii

INTEREST OF *AMICI CURIAE* ........ 1

SUMMARY OF ARGUMENT ........ 4

ARGUMENT ........ 4

I. The right to speak anonymously is constitutionally protected and deeply embedded in our nation's history ........ 4

II. Grand jury subpoenas that implicate the First Amendment warrant rigorous judicial scrutiny ........ 7

A. Where a grand jury subpoena infringes on First Amendment rights, the government must demonstrate a compelling interest in the information sought and a sufficient nexus between that information and the investigation ........ 8

B. The government lacks a compelling interest in unmasking an anonymous critic unless it has made a prima facie showing that the speaker committed a crime ........ 11

III. The Court must quash grand jury subpoenas that issued for an improper purpose, including chilling protected speech or retaliating against critics ........ 15

A. Modern grand jury subpoenas may reflect the prosecutor's purpose rather than the grand jury's ........ 16

B. The Court should consider publicly available evidence of improper purpose ........ 20

C. Publicly available evidence shows that the Administration has recently weaponized subpoenas to unmask and chill its online critics ........ 22

CONCLUSION ........ 28

CERTIFICATE OF COMPLIANCE ........ 30

CERTIFICATE OF SERVICE ........ 31

## TABLE OF AUTHORITIES

**Cases**


*Bates v. City of Little Rock*,
361 U.S. 516 (1960) ........ 8

*Branzburg v. Hayes*,
408 U.S. 665 (1972) ........ 7, 10, 18

*Buckley v. American Constitutional Law Foundation, Inc.*,
525 U.S. 182 (1999) ........ 6, 9

*Bursey v. United States*,
466 F.2d 1059 (9th Cir. 1972) ........ 7, 11, 12, 22

*Dendrite International, Inc. v. Doe No. 3*,
775 A.2d 756 (N.J. Super. Ct. App. Div. 2001) ........ 14

*Doe I v. Individuals*,
561 F. Supp. 2d 249 (D. Conn. 2008) ........ 14

*Doe v. Cahill*,
884 A.2d 451 (Del. 2005) ........ 7, 10

*Doe v. DiGenova*,
779 F.2d 74 (D.C. Cir. 1985) ........ 19

*First Choice Women's Resource Centers, Inc. v. Davenport*,
146 S. Ct. 1114 (2026) ........ 8

*Fulton County Board of Registration & Elections v. United States*,
2026 WL 1959461 (N.D. Ga. July 7, 2026) ........ 15, 19, 20

*Gibson v. Florida Legislative Investigation Committee*,
372 U.S. 539 (1963) ........ 9

*Highfields Capital Management, L.P. v. Doe*,
385 F. Supp. 2d 969 (N.D. Cal. 2005) ........ 14

*In re Anonymous Online Speakers*,
661 F.3d 1168 (9th Cir. 2011) ........ 7

*In re Grand Jury Investigation of Possible Violation of 18 U.S.C. s 1461 et seq.*,
706 F. Supp. 2d 11 (D.D.C. 2009)....................................................7, 10

*In re Grand Jury Process*,
208 F.3d 217 (8th Cir. 2000) ..........................................................................9

*In re Grand Jury Subpoena Issued to Twitter, Inc.*,
2017 WL 9485553 (N.D. Tex. Nov. 7, 2017) ..................................................10

*In re Grand Jury Subpoena No. 11116275*,
846 F. Supp. 2d 1 (D.D.C. 2012)................................................................ 10, 13

*In re Grand Jury Subpoena No. 16-03-217*,
875 F.3d 1179 (9th Cir. 2017) ........................................................................12

*In re Grand Jury Subpoena to Amazon.com Dated Aug. 7, 2006*,
246 F.R.D. 570 (W.D. Wis. 2007)....................................................................9, 10

*In re Grand Jury Subpoena to Kramerbooks & Afterwords, Inc.,*
Nos. 98-MC-135-NHJ, 98-MC-138-NHJ, 26 Med. L. Rptr. 1599 (D.D.C. Apr. 6, 1998)..........................................................................................9

*In re Grand Jury Subpoena: Subpoena Duces Tecum*,
829 F.2d 1291 (4th Cir. 1987) ..................................................................... 19, 22

*In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*,
823 F. Supp. 3d 1 (D.D.C. 2026)......................................................... 16, 20, 21

*In re Grand Jury Subpoenas to Office of New York State Attorney General*,
814 F. Supp. 3d 284 (N.D.N.Y. 2026)................................................................18

*In re Grand Jury Subpoenas*,
2026 WL 1783899 (D. Minn. June 22, 2026) ..................................... 16, 21, 22

*Lopez v. Department of Justice*,
393 F.3d 1345 (D.C. Cir. 2005)........................................................................18

*McIntyre v. Ohio Elections Commission*,
514 U.S. 334 (1995).............................................................. 4, 5, 6, 7, 15, 18

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)..........................................................................................3

*NAACP v. Alabama*,
357 U.S. 449 (1958)....8

*Nixon v. Sirica*,
487 F.2d 700 (D.C. Cir 1973)....17

*Reno v. ACLU*,
521 U.S. 844 (1997)....6

*Rosado v. Bondi*,
831 F. Supp. 3d 685 (N.D. Ill. 2026)....2

*Sinclair v. TubeSockTedD*,
596 F. Supp. 2d 128 (D.D.C. 2009)....14

*Sony Music Ent. Inc. v. Does 1-40*,
326 F. Supp. 2d 556 (S.D.N.Y. 2004)....14

*Stanford Daily Publishing Corporation v. Rubio*,
No. 5:25-cv-06618 (N.D. Cal. filed Aug. 6, 2025)....2

*Streever v. Mullin*,
No. 1:26-cv-02356-RC (D.D.C. July 6, 2026)....3

*Talley v. California*,
362 U.S. 60 (1960)....4, 5, 6, 8

*Tattered Cover, Inc. v. City of Thornton*,
44 P.3d 1044 (Colo. 2002)....10

*United States v. Calandra*,
414 U.S. 338 (1974)....7, 18

*United States v. Dionisio*,
410 U.S. 1 (1973)....19

*USA Technologies, Inc. v. Doe*,
713 F. Supp. 2d 901 (N.D. Cal. 2010)....15

*Volokh v. James*,
148 F.4th 71 (2d Cir. 2025)....2

*Watchtower Bible and Tract Society of New York v. Village of Stratton*,
536 U.S. 150 (2002)....................6

*Wood v. Georgia*,
370 U.S. 375 (1962)....................16

*X Corporation v. Media Matters for America*,
120 F.4th 190 (5th Cir. 2024)....................10

**Other Authorities**

4 William Blackstone, Commentaries on the Laws of England (1769)....................17

Brief for FIRE as *Amicus Curiae* supporting Appellant, *Stokes v. Boyce*, No. 26-60184 (5th Cir. Mar. 25, 2026)....................3

Brief for FIRE, et al., as *Amici Curiae* supporting Petitioner, *First Choice Women's Resource Centers, Inc. v. Davenport*, 146 S. Ct. 1114 (2026)....................2

Brief for NetChoice as *Amicus Curiae* supporting Petitioner, *First Choice Women's Resource Centers, Inc. v. Davenport*, 146 S. Ct. 1114 (2026)....................3

Compl. Ex. 1, *Streever v. Mullin*, 26-cv-02356-RC (D.D.C. July 6, 2026), ECF 1-1....................23

DHS, Off. of Inspector Gen., OIG-18-18, *Management Alert – CBP's Use of Examination and Summons Authority Under 19 U.S.C. § 1509* (2017)....................24

*Doe v. DHS*, 26-mc-80074 (N.D. Cal. Mar. 30, 2026), ECF 9....................27

*Doe v. DHS*, 3:25-mc-80286 (N.D. Cal. Dec. 9, 2025)....................25

Hannah Critchfield & Shane Shifflett, *How ICE Is Weaponizing Social Media Against Its Critics*, Wall Street J. (Aug. 3, 2026).................... 23, 26, 27

*In the Matter of the Subpoena Number FY25-ELC-0105*, 3:25-mc-80284 (N.D. Cal. Dec. 9, 2025)....................25

James Wilson, Just., S. Ct. of the U.S., The Subject Continued of Juries, James Wilson's Lectures on Law (1789 to 1791)....................17

Jeff Kosseff, *The United States of Anonymous: How the First Amendment Shaped Online Speech* (2022)....................5

Jimmy Jenkins & Zoe Tillman, *The DOJ Wants to Know Who on Reddit and X Is Criticizing ICE's Tactics*, Bloomberg (May 28, 2026)........................ 26, 27

John Woodrow Cox, *Homeland Security is Targeting Americans With this Secretive Legal Weapon*, Wash. Post (Feb. 3, 2026)..........................................25

Jon Van Dyke, *The Grand Jury: Representative or Elite?*, 28 Hastings L.J. 37 (1976)..............................................................................................16

Jonathan Turley, *Registering Publius: The Supreme Court and the Right to Anonymity*, 2001 Cato Sup. Ct. Rev. 57 ..................................................5

Kim Zetter, *EFF, ACLU Challenge Feds' WikiLeaks Twitter Probe*, Wired (Feb. 8, 2011)...................................................................................20

*LBRRN v. DHS*, 3:25-mc-80288 (N.D. Cal. Dec. 9, 2025) .....................................25

Mario Trujillo, *A List of ICE Subpoenas to Tech Companies*, EFF (Aug. 26, 2026) ..................................................................................................22

Mario Trujillo, *Some Tech Companies Have Privately Pushed Back on ICE Subpoenas. They Should All Do More*, EFF (Aug. 19, 2026) ............................26

Matthew Mazzotta, *Balancing Act: Finding Consensus on Standards for Unmasking Anonymous Internet Speakers*, 51 B.C. L. Rev. 833 (2010) ...........14

Motion to Quash, *Doe v. DHS*, 3:25-mc-80286 (N.D. Cal. Dec. 9, 2025), ECF 1 ..............................................................................................25

Notice of Voluntary Dismissal Pursuant to Rule 41(a)(1)(A)(i), *Doe v. DHS*, 5:26-mc-80026 (N.D. Cal.), ECF 8-1 .................................................25

Notice of Withdrawal of Summons, *Doe v. DHS*, 3:25-mc-80325 (N.D. Cal. Jan. 28, 2026), ECF 34 ..........................................................................24

Order, *Doe v. DHS*, 3:25-mc-80286 (N.D. Cal. Dec. 9, 2025), ECF 21 ................25

*Podslurp v. DHS*, 1:26-mc-00861 (W.D. Texas Aug. 20, 2026)............................27

Reddit, *Transparency Report: January to June 2025* ............................................26

Reddit, *Transparency Report: July to December 2025* ..........................................26

Renee B. Lettow, *Reviving Federal Grand Jury Presentments*, 103 Yale L.J. 1333 (1994) .......... 17, 18

Reverend Hillary Streever in Support of Plaintiffs' Motion for Preliminary Injunction, *Streever v. Mullin*, 26-cv-02356-RC (D.D.C. July 6, 2026), ECF 9-2 .......... 23

Sam Levine, *Trump's DHS Is Using an Obscure Law to Secretly Snoop on Journalists, Non-Profits and Unions: It's Outrageous*, Guardian (Aug. 29, 2026) .......... 24

Transcript, *Doe v. DHS*, 3:25-mc-80325 (N.D. Cal. Jan. 28, 2026), ECF 35 .......... 24

## GLOSSARY

| | |
|---|---|
| **ACLU** | American Civil Liberties Union |
| **ACLU-D.C.** | American Civil Liberties Union of the District of Columbia |
| **CIR** | Center for Individual Rights |
| **DHS** | Department of Homeland Security |
| **DOJ** | Department of Justice |
| **EFF** | Electronic Frontier Foundation |
| **FIRE** | Foundation for Individual Rights and Expression |

## INTEREST OF *AMICI CURIAE*[1]

The American Civil Liberties Union ("ACLU") is a nationwide, non-partisan, non-profit organization that seeks to protect Americans' civil liberties. ACLU-D.C. is the District of Columbia affiliate of the ACLU. ACLU and ACLU-D.C. have represented individuals whose personal information has been targeted via subpoenas to technology companies—not for any lawful investigative purpose, but to chill or punish their speech. Based on *amici*'s experience and public reporting, *amici* are concerned that, having failed to unmask anonymous critics using administrative subpoenas, the Administration is now turning to grand jury subpoenas to accomplish the same ends.

The Electronic Frontier Foundation ("EFF") is a member-supported, non-profit civil liberties organization that for more than 30 years has worked to protect and promote digital privacy, free speech, and innovation. With more than 30,000 active members, EFF regularly participates as *amicus* or counsel in cases involving the intersection of privacy, free speech, and technology, including representing users who are the target of third-party subpoenas.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), counsel for *amici curiae* certify that no person or entity, other than *amici curiae*, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. All parties to this case have consented to the filing of this brief.

The Center for Individual Rights ("CIR") is a national, nonpartisan, public-interest law firm founded in 1989 to strengthen and restore the individual rights essential to a free and flourishing society. Through its free speech practice, CIR represents individuals directly and participates as amicus in cases involving suppression of, or retaliation for, protected speech, including subpoenas seeking the identities of anonymous online speakers. CIR has a substantial interest in ensuring that courts rigorously scrutinize any effort to pierce a speaker's anonymity as the price of criticizing those in power.

The Foundation for Individual Rights and Expression ("FIRE") is a nonpartisan nonprofit that defends the individual rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended First Amendment rights nationwide without regard to speakers' views through public advocacy, targeted litigation, and *amicus curiae* filings in cases implicating expressive rights. *See, e.g.*, Brief for FIRE, et al., as *Amici Curiae* supporting Petitioner, *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114 (2026); *Stanford Daily Publ'g Corp. v. Rubio*, No. 5:25-cv-06618 (N.D. Cal. filed Aug. 6, 2025) (counsel); *Volokh v. James*, 148 F.4th 71 (2d Cir. 2025) (counsel). FIRE's work includes protecting the right to be free from governmental retaliation for protected speech. *See, e.g.*, *Rosado v. Bondi*, 831 F. Supp. 3d 685 (N.D. Ill. 2026) (counsel); *Streever v. Mullin*, No. 1:26-cv-02356-RC

(D.D.C. July 6, 2026) (counsel); Brief for FIRE as *Amicus Curiae* supporting Appellant, *Stokes v. Boyce*, No. 26-60184 (5th Cir. Mar. 25, 2026).

The Cato Institute is a nonpartisan public-policy research foundation established in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Project on Criminal Justice was founded in 1999 and focuses in particular on the scope of substantive criminal liability, the proper and effective role of police in their communities, the protection of constitutional and statutory safeguards for criminal suspects and defendants, citizen participation in the criminal justice system, and accountability for law enforcement officers.

NetChoice is a national trade association of online business that works to protect free expression and free enterprise on the internet. Its members operate many of the services through which Americans speak to one another in the digital age—including through anonymous and pseudonymous speech. NetChoice litigates extensively in defense of that speech, most notably in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). NetChoice also regularly files amicus briefs supporting online speech and anonymity. *See, e.g.*, Brief for NetChoice as *Amicus Curiae* supporting Petitioner, *First Choice Women's Res. Ctrs., Inc.*, 146 S. Ct. 1114.

## SUMMARY OF ARGUMENT

The right to anonymity is deeply rooted in American history and serves critical functions online and off. When a grand jury subpoena seeks to unmask an anonymous speaker's identity, careful judicial scrutiny is warranted. The government's interest in unmasking will not be sufficiently compelling to justify piercing a speaker's anonymity unless the government has made a prima facie showing that the speaker committed a crime. Independently, chilling the speech of or retaliating against critics of the government is an improper purpose for a grand jury subpoena that justifies quashing it. Weaponizing grand jury subpoenas for this purpose runs counter to the grand jury's original function as a bulwark against government overreach, and should not be tolerated.

## ARGUMENT

### I. The right to speak anonymously is constitutionally protected and deeply embedded in our nation's history.

Anonymity has long served to protect the right to dissent, foster public debate, and grow the marketplace of ideas. Since colonial times, anonymous speech has operated as a "shield from the tyranny of the majority." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995). Before the Revolutionary War, "colonial patriots" often wrote and distributed controversial literature anonymously, fearing prosecution by the English-controlled courts. *Talley v. California*, 362 U.S. 60, 65 (1960).

Perhaps most famously, the very papers written to urge the adoption of our Constitution were published pseudonymously. *Id.* at 65. When James Madison, Alexander Hamilton, and John Jay wrote the Federalist Papers, they signed with "Publius" rather than their real names. *McIntyre*, 514 U.S. at 343 n.6. Their use of a pseudonym reflects the reality that "[f]or the Framers and their contemporaries, anonymity was the deciding factor between whether their writings would produce a social exchange or a personal beating." Jonathan Turley, *Registering Publius: The Supreme Court and the Right to Anonymity*, 2001 Cato Sup. Ct. Rev. 57, 58. Anonymity thus "exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society." *McIntyre*, 514 U.S. at 357.

Of course, the "threat of persecution" is not the only reason an individual might speak or write anonymously. A speaker might assume anonymity "to preserve as much of one's privacy as possible." *Id.* at 342. A speaker may wish to "separate his private life from his very public statements and the surrounding controversy." Jeff Kosseff, *The United States of Anonymous: How the First Amendment Shaped Online Speech* 14-15 (2022). Or "an advocate may believe her ideas will be more persuasive if her readers are unaware of her identity." *McIntyre*, 514 U.S. at 342. Writing anonymously "provides a way for a writer who may be personally unpopular

to ensure that readers will not prejudge her message simply because they do not like its proponent." *Id.*

Anonymity "has sometimes been assumed for the most constructive purposes" and has played an "important role in the progress of mankind." *Talley*, 362 U.S. at 64, 65. It is no surprise, then, that the Supreme Court has "embraced a respected tradition of anonymity in the advocacy of political causes," even in the face of competing government interests. *McIntyre*, 514 U.S. at 343 (footnote omitted). For example, in *Talley*, the Court held unconstitutional an ordinance barring handbills that did not display their sponsors' identifying information. 362 U.S. at 63-64. In *McIntyre*, the Court upheld the right to distribute anonymous campaign literature. 514 U.S. at 357. In *Buckley v. American Constitutional Law Foundation, Inc.*, the Court held that Colorado could not require petition circulators to wear name badges. 525 U.S. 182, 200 (1999). And in *Watchtower Bible and Tract Society of New York v. Village of Stratton*, the Court held unconstitutional an ordinance prohibiting door-to-door advocacy without registration and a permit. 536 U.S. 150, 153, 164 (2002).

Today, there is no question that "an author's decision to remain anonymous . . . is an aspect of the freedom of speech protected by the First Amendment." *McIntyre*, 514 U.S. at 342. That rings just as true online as in print. *See Reno v. ACLU*, 521 U.S. 844, 870 (1997) (finding "no basis for qualifying the level of First [A]mendment scrutiny [] applied to" the internet). Just as in the

physical world, "the ability to speak anonymously on the Internet promotes the robust exchange of ideas and allows individuals to express themselves freely without 'fear of economic or official retaliation" or "'concern about social ostracism.'" *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011) (quoting *McIntyre*, 514 U.S. at 341-42). Anonymous speech online is "the modern equivalent of political pamphleteering," *Doe v. Cahill*, 884 A.2d 451, 456 (Del. 2005), and must be zealously protected.

## II. Grand jury subpoenas that implicate the First Amendment warrant rigorous judicial scrutiny.

A government's interest in investigating potential violations of law "does not automatically override First Amendment rights." *Bursey v. United States*, 466 F.2d 1059, 1086 (9th Cir. 1972). While the grand jury's subpoena power is broad, it "must operate within the limits of the First Amendment." *Branzburg v. Hayes*, 408 U.S. 665, 708 (1972). If compliance with a grand jury subpoena would violate a constitutional right, "[j]udicial supervision is properly exercised . . . to prevent the wrong before it occurs." *United States v. Calandra*, 414 U.S. 338, 346 (1974); *see also In re Grand Jury Investigation of Possible Violation of 18 U.S.C. s 1461 et seq.*, 706 F. Supp. 2d 11, 14 (D.D.C. 2009) ("[I]t is clear that a subpoena may be quashed if it cannot withstand constitutional scrutiny.").

Where a grand jury subpoena implicates First Amendment rights, courts have required the government to demonstrate a compelling interest in the information

sought and a sufficient nexus between that information and the investigation. This Court should hold that the government does not have a compelling interest in unmasking an anonymous speaker unless it has made a prima facie showing that the speaker committed a crime.

### A. Where a grand jury subpoena infringes on First Amendment rights, the government must demonstrate a compelling interest in the information sought and a sufficient nexus between that information and the investigation.

The First Amendment prohibits the government from "marginalizing dissident voices and reshaping the marketplace of ideas to its pleasure" by "subtle . . . interference with protected liberties no less than . . . heavy-handed frontal attack[s]." *First Choice Women's Res. Ctrs., Inc.*, 146 S. Ct. at 1130 (citation modified). The Supreme Court has long recognized that "identification and fear of reprisal might deter perfectly peaceful discussions of public matters of importance." *Talley*, 362 U.S. at 65. For that reason, the government cannot freely "compel members of groups engaged in the dissemination of ideas to be publicly identified." *Id.* (citing *Bates v. City of Little Rock*, 361 U.S. 516, 516 (1960), and *NAACP v. Alabama*, 357 U.S. 449, 462 (1958)). For the same reason, the government lacks unbridled discretion to compel the unmasking of its critics. *See, e.g.*, *id.* at 63-64

(handbills need not disclose sponsors' identifying information); *Buckley*, 525 U.S. at 200 (petition circulators need not wear an identification badge).

While the Supreme Court has "never directly" imposed a heightened standard on grand jury subpoenas that implicate the First Amendment, it has "implied that lower courts should be mindful of any non-speculative First Amendment concerns when determining motions to quash subpoenas." *In re Grand Jury Subpoena to Amazon.com Dated Aug. 7, 2006*, 246 F.R.D. 570, 572 (W.D. Wis. 2007). The Court has also recognized that "it is an essential prerequisite to the validity of an investigation which intrudes into the area of constitutionally protected rights of speech, press, association and petition that the State convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest." *Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539, 546 (1963).

Accordingly, several courts have held that, where grand jury subpoenas directly implicate legitimate First Amendment concerns, "the government must demonstrate a compelling interest in the information sought" as well as "a sufficient connection between the information sought and the grand jury investigation." *In re Grand Jury Subpoena to Kramerbooks & Afterwords, Inc.,* Nos. 98-MC-135-NHJ, 98-MC-138-NHJ, 26 Med. L. Rptr. 1599, 1601 (D.D.C. Apr. 6, 1998) (collecting cases); *accord In re Grand Jury Proc.*, 208 F.3d 217 (8th Cir. 2000); *In re Grand Jury Investigation of Possible Violation of 18 U.S.C. s 1461 et seq.*, 706 F. Supp. 2d

at 18; *In re Grand Jury Subpoena No. 11116275*, 846 F. Supp. 2d 1, 4 (D.D.C. 2012); *In re Grand Jury Subpoena Issued to Twitter, Inc.*, 2017 WL 9485553, at *5 (N.D. Tex. Nov. 7, 2017), *report and recommendation adopted*, 2018 WL 2421867 (N.D. Tex. May 3, 2018); *In re Grand Jury Subpoena to Amazon.com Dated Aug. 7, 2006*, 246 F.R.D. at 572.[2]

Requiring that the government show a compelling interest in the information sought and a sufficient nexus to the investigation is particularly appropriate where compliance with a grand jury subpoena will pierce a speaker's anonymity, since disclosures of this sort impose a "First Amendment injury [that] could not be undone." *See X Corp. v. Media Matters for Am.*, 120 F.4th 190, 196 (5th Cir. 2024). In the context of unmasking anonymous online critics, "setting the standard too low [would] chill potential posters from exercising their First Amendment right to speak anonymously." *Cahill*, 884 A.2d at 457.

[2] This rule is consistent with the Supreme Court's opinion in *Branzburg*, which held that reporters have the same obligations to comply with grand jury subpoenas as other citizens do. 408 U.S. at 682. Because the Court believed the asserted reporter's privilege was outside the scope of First Amendment protection, it did not decide which test applies when a grand jury subpoena intrudes on First Amendment-protected activity. *See id.* But "the Court did not foreclose lower courts from creating such a test and, relevantly, did not disapprove of the two-part test that had been used by the lower court in *Branzburg*, and was ultimately adopted by the *Kramerbooks* court." *Tattered Cover, Inc. v. City of Thornton*, 44 P.3d 1044, 1056 n.22 (Colo. 2002), *as modified on denial of reh'g* (Apr. 29, 2002).

### B. The government lacks a compelling interest in unmasking an anonymous critic unless it has made a prima facie showing that the speaker committed a crime.

While courts have not articulated a specific test for determining whether the government has a compelling interest in unmasking an anonymous speaker in the context of a motion to quash a grand jury subpoena, *amici* contend the government must make a prima facie showing that the speaker committed a crime. This requirement flows naturally from the compelling interest standard and finds additional support in cases considering motions to quash civil discovery subpoenas demanding disclosure of an anonymous speaker's identity.

The Ninth Circuit applied a similar approach in *Bursey*. There, staff members of the Black Panther Party's newspaper were called to testify before a grand jury investigating threats to the President and interference with armed forces. 466 F.2d at 1082. The court held they could not be compelled to answer questions about publishing an article that stated "Kill General Abrams and his staff, all his officers," *id.* at 1067, because "[p]rinting, publishing, or distributing the speech or the article is not criminal unless the persons who did these acts had the specific intent required by the statutes which were the basis of the investigation," and the government "made no showing that there was a substantial possibility that any of the actors had the requisite intent." *Id.* at 1087. In other words, the government's failure to make a prima facie showing that the statutes were violated meant it could not compel

testimony to "disclose the identity of all persons who worked on the paper and the pamphlets." *Id.* at 1087-88.

The court further explained why requiring a prima facie showing—as opposed to a mere inference that the speaker committed a crime—was necessary: If the court permitted "the exercise of editorial judgments" to "raise[] an inference that the persons involved in the judgments had or may have had criminal intent," then "[a]ny editor, reporter, typesetter, or cameraman could be compelled to reveal the same information about his paper or television station, if his paper or station carried the story." *Id.* at 1087-88 (citation modified). "The First Amendment forbids that result." *Id.*[3]

The District Court for the District of Columbia has also applied the prima facie requirement in this context. In a case concerning a grand jury subpoena served on Twitter to unmask the identity of a user who posted "I want to [f***] Michelle Bachman in the ass with a Vietnam era machete," the court recognized that "[t]he First Amendment limits the authority of the federal government to criminalize speech, and in this context would only allow prosecution of Mr. X if his tweet constituted a 'true threat.'" *In re Grand Jury Subpoena No. 11116275*, 846 F. Supp.

---

[3] The Ninth Circuit's decision in *In re Grand Jury Subpoena No. 16-03-217*, 875 F.3d 1179 (9th Cir. 2017) does not undercut this analysis from *Bursey*. There, the court applied a different framework to analyze the case at bar but recognized *Bursey*'s continued vitality. *See id.* at 1189.

2d at 5. The court found that Mr. X's statement "[o]n its face . . . expresses a threat of violence" in that it describes "the forcible insertion of an extremely sharp, real-world weapon into Ms. Bachmann's rectum, which, if performed, would undoubtedly cause serious bodily injury—and likely death." *Id.* at 7.

Because the court found Mr. X "tweeted a *prima facie* threat," there was a compelling need to unmask Mr. X's identity so that the grand jury could investigate Mr. X's subjective intent. *Id.* at 6, 8 ("The grand jury ought to know if Mr. X has a history of making threats to political candidates in other forums, or has stalked or engaged in other sinister behavior toward Ms. Bachmann, or happens to actually own a Vietnam-era machete."). Of course, a prima facie showing does not amount to probable cause, but it is a sufficient showing to guard against an "absurd" future where the government could "subpoena any Web site any time any anonymous user made any post containing a mere scintilla of violence." *Id.* at 8. If that occurred, "[a]nonymity on the Internet would be sufficiently compromised to warrant this Court's concern." *Id.* Thus, finding that the anonymous user had tweeted a prima facie threat was a necessary safeguard to ensure the investigation was "nowhere near that slippery slope." *Id.* at 8.

Courts around the country apply a similar safeguard in cases evaluating civil discovery subpoenas seeking to compel internet service providers to disclose their users' identities: A party must make a prima facie showing that an anonymous

speaker violated the law before compelling disclosure of their identity. *See Dendrite Int'l, Inc. v. Doe No. 3*, 775 A.2d 756, 760 (N.J. Super. Ct. App. Div. 2001) (originating widely-followed standard under which plaintiff requesting disclosure "must produce sufficient evidence supporting each element of its cause of action, on a prima facie basis, prior to a court ordering the disclosure of the identity of the unnamed defendant"); *see, e.g.*, *Sinclair v. TubeSockTedD*, 596 F. Supp. 2d 128, 132 (D.D.C. 2009) (citing authorities requiring "prima facie" showing and quashing unmasking subpoenas served by plaintiff whose defamation action was "fundamentally flawed" including because it failed to allege special damages or actual malice); *Highfields Cap. Mgmt., L.P. v. Doe*, 385 F. Supp. 2d 969, 977-78 (N.D. Cal. 2005) (granting anonymous defendant's motion to quash unmasking subpoena in trademark action because plaintiff failed to make prima facie showing of speech's commercial character and likelihood to cause confusion); *see generally* Matthew Mazzotta, *Balancing Act: Finding Consensus on Standards for Unmasking Anonymous Internet Speakers*, 51 B.C. L. Rev. 833, 849 (2010) (collecting cases).

Of course, plaintiffs are often able to make the requisite prima facie showing to justify unmasking defendants. *See, e.g.*, *Sony Music Ent. Inc. v. Does 1-40*, 326 F. Supp. 2d 556, 565 (S.D.N.Y. 2004) (permitting unmasking where plaintiffs demonstrated prima facie case of copyright infringement); *Doe I v. Individuals*, 561 F. Supp. 2d 249, 256 (D. Conn. 2008) (permitting unmasking where plaintiff

demonstrated prima facie case of libel). But in requiring a prima facie showing that the anonymous speaker violated the law as a prerequisite to unmasking, these courts have recognized "the Constitutional protection afforded pseudonymous speech over the internet, and the chilling effect that subpoenas would have on lawful commentary and protest." *USA Techs., Inc. v. Doe*, 713 F. Supp. 2d 901, 906 (N.D. Cal. 2010). Their continued reliance on this standard reflects that it does not unduly impede investigations. Indeed, this requirement will help ensure that grand jury investigations serve the grand jury's "ultimate purpose: to help the prosecutor indict *valid* criminal charges." *Fulton Cnty. Bd. of Registration & Elections v. United States*, 2026 WL 1959461, at *7 (N.D. Ga. July 7, 2026) (emphasis added).

In order to preserve this country's "honorable tradition of advocacy and of dissent," *McIntyre*, 514 U.S. at 357, this Court should clarify that a grand jury subpoena to unmask an anonymous speaker must be quashed absent a prima facie showing that the speaker committed a crime.

## III. The Court must quash grand jury subpoenas that issued for an improper purpose, including chilling protected speech or retaliating against critics.

Independent of whether or not the government has made a prima facie showing that the speaker committed a crime, a grand jury subpoena must be quashed if it issued for an improper purpose. Even a subpoena seeking information relevant to a valid criminal investigation should be quashed if its dominant purpose was

improper. *See In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, 823 F. Supp. 3d 1, 10 (D.D.C. 2026); *In re Grand Jury Subpoenas*, 2026 WL 1783899, at *5 (D. Minn. June 22, 2026).

The historic role of the grand jury as a bulwark against government overreach and the modern-day executive branch's outsized role in issuing grand jury subpoenas make it especially important that the Court attend to evidence of an improper purpose. Here, substantial evidence suggests that the federal government has recently weaponized subpoena processes for the purpose of chilling and retaliating against critics—as opposed to furthering legitimate investigations. The Court can and should consider this publicly available information, as well as evidence in the record, in evaluating the motion at issue.

### A. Modern grand jury subpoenas may reflect the prosecutor's purpose rather than the grand jury's.

The grand jury has historically "been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution . . . standing between the accuser and the accused." *Wood v. Georgia*, 370 U.S. 375, 390 (1962). In ratification debates, Anti-Federalists feared that without a Constitutional right to a grand jury, executive prosecutorial power would go unchecked. *See* Jon Van Dyke, *The Grand Jury: Representative or Elite?*, 28 Hastings L.J. 37, 39 (1976). Federalists, too, recognized the value of the grand jury's independence from

prosecutors.[4] By placing the Grand Jury Clause in the Bill of Rights, the Founders created the grand jury as "a constitutional fixture in its own right, legally independent of the Executive." *Nixon v. Sirica*, 487 F.2d 700, 713 n.54 (D.C. Cir 1973) (citation omitted).

The grand jury's role alongside the trial jury as a "strong and two-fold barrier" "between the liberties of the people, and the prerogative of the crown," 4 William Blackstone, Commentaries on the Laws of England 343, 345 (1769), necessitated considerable discretion and independence. In the years leading up to the Revolution, "[g]rand juries took advantage of their wide investigative powers . . . and gained prominence in fighting government corruption by issuing presentments against royal officials." *See* Renee B. Lettow, *Reviving Federal Grand Jury Presentments*, 103 Yale L.J. 1333, 1336 (1994) (footnote omitted). And they stood in the way of the government punishing anonymous speech critical of the crown. For example, multiple grand juries refused to indict John Peter Zenger, who was charged with libel for publishing and refusing to unmask anonymous critics of the colonial Governor

---

[4] *See* James Wilson, Just., S. Ct. of the U.S., The Subject Continued of Juries, James Wilson's Lectures on Law: Part 2, Chapter VI (1789 to 1791), https://contextus.org/James_Wilson's_Lectures_on_Law_(1789_to_1791)?tab=contents (explaining that grand jurors "are not appointed for the prosecutor or for the court: they are appointed for the government and for the people.").

of New York. *See id.* at 1337 n.16; *see also McIntyre*, 514 U.S. at 361 (Thomas, J., concurring) (explaining authors were anonymous).

"The scope of the grand jury's powers reflects its special role in insuring fair and effective law enforcement." *Calandra*, 414 U.S. at 343. The assumption underlying the grand jury's broad investigative authority is that grand juries serve the "dual function of determining if there is probable cause to believe that a crime has been committed and of protecting citizens against unfounded criminal prosecutions." *Branzburg*, 408 U.S. at 686-87.

But in recent years, grand juries' ancient investigative power has been usurped by professional prosecutors. "[I]n modern federal practice, prosecutors often issue grand jury subpoenas with little or no involvement of the grand jurors themselves." *In re Grand Jury Subpoenas to Off. of N.Y. State Att'y Gen.*, 814 F. Supp. 3d 284, 298-99 (N.D.N.Y. 2026) (footnote omitted). Indeed, "the term 'grand jury subpoena' is in some respects a misnomer, because the grand jury itself does not decide whether to issue the subpoena; the prosecuting attorney does." *Lopez v. DOJ*, 393 F.3d 1345, 1349 (D.C. Cir. 2005) (quotation omitted). Grand jurors might not even know a grand jury subpoena was issued—let alone weigh in on whether the subpoena was necessary or relevant to the investigation. *See id.* at 1349. Grand jury subpoenas are simply "instrumentalities of the United States Attorney's office although issued under the district court's name and for the grand jury." *In re Grand Jury Subpoena:*

*Subpoena Duces Tecum*, 829 F.2d 1291, 1296-97 (4th Cir. 1987). Thus, in modern times, the discretion at issue in serving grand jury subpoenas is exercised by the executive branch—the Department of Justice—not the grand jury itself or the judicial branch. *See Doe v. DiGenova*, 779 F.2d 74, 80, 84 (D.C. Cir. 1985) ("[G]rand jury subpoenas are issued at the request, and in the discretion of the prosecuting attorney involved in the case . . . without prior approval by the head of the agency, the grand jury, or any judge."). These modern realities create the risk that the Department of Justice will "use the Grand Jury to do whatever the DOJ wants," *Fulton Cnty. Bd. of Registration & Elections*, 2026 WL 1959461, at *2.

The DOJ may be equipped to fulfill *one* of the grand jury's functions: "bring[ing] to trial those who may be guilty." *United States v. Dionisio*, 410 U.S. 1, 17-18 (1973). But a prosecutor himself cannot serve as "a protective bulwark standing solidly between the ordinary citizen and an overzealous prosecutor." *Id.*

Because modern grand jury subpoenas reflect the prosecutor's will and not the grand jury's, they do not merit the same type of deference as other investigatory actions undertaken by the grand jury itself. Today, only the court can ensure that "overzealous investigators" do not use grand jury subpoenas to "run[] roughshod over an individual's privacy." *DiGenova*, 779 F.2d at 84.

It is "fitting" for courts to scrutinize grand jury subpoenas, because otherwise, "anyone in power (perhaps the next administration of a different party) could use the

Grand Jury process similarly to subpoena personal information of citizens (perhaps that of their political opponents) with no legitimate law enforcement purpose." *Fulton Cnty. Bd. of Registration & Elections*, 2026 WL 1959461, at *2. *Amici* staunchly oppose *any* administration's use of grand jury subpoenas to accomplish an improper purpose.[5] "[E]veryone, whether you support the President or you do not . . . should be concerned about the DOJ's ability to utilize the power of the Grand Jury to appropriate your private information without a legitimate purpose." *Fulton Cnty. Bd. Of Registration & Elections*, 2026 WL 1959461, at *2.

### B. The Court should consider publicly available evidence of improper purpose.

While the government does not typically need to establish probable cause to obtain a grand jury subpoena, "when the evidence of improper purpose is overwhelming, that might require the Government to show something akin to probable cause." *In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, 823 F. Supp. 3d. at 11.

Evidence of an improper purpose can come in the form of public statements and reporting. For example, Judge Boasberg recently found that certain grand jury subpoenas' dominant purpose was to harass Jerome Powell to pressure him to lower

[5] *See, e.g.*, Kim Zetter, *EFF, ACLU Challenge Feds' WikiLeaks Twitter Probe*, Wired (Feb. 8, 2011), https://perma.cc/8YNT-JBKN.

interest rates. *Id.* at 11. This finding was based on a "mountain of evidence," including many public Truth Social posts by President Trump criticizing Powell for refusing to lower rates. *Id.* The court quashed the subpoenas because the publicly available "evidence of improper motive" was "so strong," and the purported justifications for the subpoenas were "so tenuous" that it was hard to see the investigation "as anything other than a convenient pretext for launching a criminal investigation that the Government launched for another, unstated purpose: pressuring Powell to knuckle under." *Id.* at 14.

Judge Patrick Schiltz recently quashed grand jury subpoenas seeking information related to immigration enforcement in the face of "overwhelming evidence" that they "were not issued to investigate, but to harass, coerce, and retaliate." *In re Grand Jury Subpoenas*, 2026 WL 1783899, at *10. The court cited President Trump's directions to withhold federal funding from sanctuary jurisdictions and his social media posts criticizing Minnesota's failure to cooperate with ICE and threatening Minnesota's political leaders with "RETRIBUTION," and a letter from Pam Bondi to Governor Walz demanding that Minnesota repeal its sanctuary policies. *Id.* at *6-7. The court also cited "the Trump administration's well-established history of using criminal investigations to retaliate against and pressure the President's political and personal adversaries." *Id.* at *7 (citing *In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, 823 F. Supp. 3d at 5). On the

other side of the balance, the government's examples of incidents purportedly justifying its investigation had only "spurious" connections to "any possible criminal conduct." *Id.* at *9. The fact that "connections between the information sought in the subpoenas and any possible criminal violation range from extremely weak to nonexistent" supported the conclusion that the subpoenas issued for an improper retaliatory, coercive purpose. *Id.* at *10.

"Subpoenas duces tecum are not insulated from review merely because they are issued in connection with a sitting grand jury." *In re Grand Jury Subpoena: Subpoena Duces Tecum*, 829 F.2d at 1296. When substantial evidence suggests that grand jury subpoenas are being used for an improper purpose, they must be quashed. "It would be a cruel twist of history to allow the institution of the grand jury that was designed at least partially to protect political dissent to become an instrument of political suppression." *Bursey*, 466 F.2d at 1089.

### C. Publicly available evidence shows that the Administration has recently weaponized subpoenas to unmask and chill its online critics.

Public reporting and sworn court filings demonstrate the Administration's recent use of subpoena processes to chill speech.[6] The *Wall Street Journal* recently reported that "ICE has deployed a round-the-clock digital dragnet to scour the public

[6] *See, e.g.*, Mario Trujillo, *A List of ICE Subpoenas to Tech Companies*, EFF (Aug. 26, 2026), https://perma.cc/ENY7-JG2Y.

Internet—from Facebook to Instagram to X—for speech that could endanger the agency's mission."[7] As part of this initiative, the Department of Homeland Security (DHS) "has sent hundreds of subpoenas to social-media companies" to unmask the social media users.[8]

When companies comply, and DHS learns their critics' identities, DHS has "tracked down Americans at work and on the road, asking them to sign letters acknowledging their online speech about ICE 'may' be a crime."[9] In June, ICE officials visited a priest's home and delivered a written warning for her husband, who had emailed ICE's acting director stating that he was a "monstrous human being and will go down in history as America's Reinhard Heydrich, the butcher." Rev. Hillary Streever in Support of Pl.'s Mot. for Prelim. Inj. ¶¶ 4, 7-12, *Streever v. Mullin*, 26-cv-02356-RC (D.D.C. July 6, 2026), ECF 9-2; Compl. Ex. 1 at 2, ECF 1-1.

DHS has engaged in similarly troubling conduct using administrative subpoenas. DHS officials have served many such subpoenas on technology companies, seeking identifying information about users who criticized DHS online.

---

[7] Hannah Critchfield & Shane Shifflett, *How ICE Is Weaponizing Social Media Against Its Critics*, Wall Street J. (Aug. 3, 2026), https://perma.cc/3W9H-5ETL.

[8] *Id.*

[9] *Id.*

For example, on September 11, 2025, DHS sent administrative subpoenas to Meta to unmask users associated with accounts that aim to spread awareness of immigration enforcement activity in Pennsylvania. The subpoenas cited a federal customs statute, 19 U.S.C. § 1509, as their authority, despite no indication that the investigation was related to imports, exports, or anything within the statute's reach. As demonstrated in a 2017 report by the Office of the Inspector General, DHS has a history of using Section 1509 subpoenas for improper purposes.[10] Users moved to quash, arguing the subpoenas violated the First Amendment and exceeded DHS's statutory authority. The court held an oral argument at which it expressed skepticism about DHS's subpoenas. *See* Tr. 13:3-15:9, 41:14-43:15, *Doe v. DHS*, 3:25-mc-80325 (N.D. Cal. Jan. 28, 2026), ECF 35.[11] Shortly thereafter, DHS withdrew the subpoenas. *See* Notice of Withdrawal of Summons, *Doe v. DHS*, 3:25-mc-80325, ECF 34.

Similarly, on September 4, 2025, DHS sent an administrative subpoena to Meta seeking information about six accounts that documented immigration law

---

[10] *See* DHS, Off. of Inspector Gen., OIG-18-18, *Management Alert – CBP's Use of Examination and Summons Authority Under 19 U.S.C. § 1509* (2017), https://perma.cc/Z6Y4-ZTY2; *see also* Sam Levine, *Trump's DHS Is Using an Obscure Law to Secretly Snoop on Journalists, Non-Profits and Unions: It's Outrageous*, Guardian (Aug. 29, 2026), https://perma.cc/7C5A-XYGF.

[11] *See also* Joseph Menn, *ICE And Activists Clash Over Doxing and Privacy, in Court and Streets*, Wash. Post (Jan 15, 2026), https://perma.cc/W7NC-4TAS.

enforcement activity in California. Users challenged the subpoena on statutory and First Amendment grounds. *See Doe v. DHS*, 3:25-mc-80286 (N.D. Cal. Dec. 9, 2025); *In the Matter of the Subpoena Number FY25-ELC-0105*, 3:25-mc-80284 (N.D. Cal. Dec. 9, 2025); *LBRRN v. DHS*, 3:25-mc-80288 (N.D. Cal. Dec. 9, 2025). The subpoenas cited 8 U.S.C. § 1225(d) as their authority, but that statute does not permit the use of subpoenas to reveal the identities of unknown third parties. *See* Mot. to Quash at 16-17, *Doe v. DHS*, 3:25-mc-80286, ECF 1. Nor does it permit the issuance of administrative subpoenas to investigate alleged officer safety concerns or doxing—the two purposes referenced in the subpoena. *See id.* at 17-18. Rather than defend the subpoena in court, DHS withdrew it. *See* Order at 2, *Doe v. DHS*, 3:25-mc-80286, ECF 21.

Again, on October 30, 2025, DHS sent Google an administrative subpoena seeking information about a retiree who sent an email via Gmail to a prosecutor criticizing his handling of an asylum case. The user challenged the subpoena on statutory and First Amendment grounds. DHS withdrew the subpoena rather than defending it in court. *See* Notice of Voluntary Dismissal Pursuant to Rule 41(a)(1)(A)(i), *Doe v. DHS*, 5:26-mc-80026 (N.D. Cal.), ECF 8-1.[12]

---

[12] *See also* John Woodrow Cox, *Homeland Security is Targeting Americans With this Secretive Legal Weapon*, Wash. Post (Feb. 3, 2026), https://perma.cc/SRZ3-84SX.

In late 2025, after DHS sent Reddit administrative subpoenas seeking information about “11 Reddit accounts that posted content critical of ICE actions,” and Reddit objected on First Amendment grounds, DHS withdrew the subpoenas.[13]

DHS’s practice of withdrawing administrative subpoenas instead of litigating users’ motions to quash prevents courts from ruling on their legality.[14] But DHS’s withdrawal of an administrative subpoena does not necessarily end the agency’s quest to uncover the user’s identity; it merely moves it out of public view.

Recently, after withdrawing administrative subpoenas, federal prosecutors have issued grand jury subpoenas seeking similar records.[15] Grand jury secrecy rules make it difficult to know the full extent of the government’s use of grand jury subpoenas to chill the exercise of First Amendment rights, but some examples have been publicly reported.

---

[13] *See* Reddit, *Transparency Report: July to December 2025*, https://perma.cc/2XRS-9WZP. In one case in early 2025, DHS reportedly withdrew an administrative subpoena asking for “information for a Reddit account” after Reddit simply followed up for more information. *See* Reddit, *Transparency Report: January to June 2025*, https://perma.cc/W76V-BBUT.

[14] *See* Mario Trujillo, *Some Tech Companies Have Privately Pushed Back on ICE Subpoenas. They Should All Do More*, EFF (Aug. 19, 2026), https://perma.cc/K8JK-4UQ9.

[15] *See, e.g.*, Critchfield & Shifflett, *supra* note 7; Jimmy Jenkins & Zoe Tillman, *The DOJ Wants to Know Who on Reddit and X Is Criticizing ICE’s Tactics*, Bloomberg (May 28, 2026), https://perma.cc/PF52-8J2P.

On February 19, 2026, DHS sent an administrative subpoena to Reddit seeking information about the user account "Tired_Thumb." After the user challenged the subpoena on statutory and First Amendment grounds, DHS withdrew it. *See Doe v. DHS*, 26-mc-80074 (N.D. Cal. Mar. 30, 2026), ECF 9. But days later, a grand jury subpoena issued to Reddit seeking similar information about the same account.[16]

Similarly, on February 27, 2026, DHS sent an administrative subpoena to X seeking information about the "podslurp" account, which made a sarcastic post about donating to the ICE officer who reportedly shot Renee Good in Minneapolis and posted publicly available address information. *See Podslurp v. DHS*, 1:26-mc-00861 (W.D. Texas Aug. 20, 2026). In May 2026, DHS withdrew the administrative subpoena.[17] The government then issued a grand jury subpoena to X seeking similar information about the same account.[18]

The use of grand jury subpoenas to seek information that DHS had unsuccessfully (and unlawfully) attempted to obtain through administrative subpoenas is alarming, as it chills anonymous speech and turns the purpose of the grand jury on its head. By proceeding with grand jury investigations, the government

---

[16] *See* Critchfield & Shifflett, *supra* note 7.

[17] *See* Jenkins & Tillman, *supra* note 15.

[18] *Id.*

can largely evade judicial and public scrutiny, rendering anonymous speakers vulnerable to violations of their rights and substantial chilling effects, and contradicting the grand jury's original purpose.

## CONCLUSION

The Court should apply rigorous scrutiny to the challenged subpoena and require the government to make a prima facie showing that the anonymous speaker committed a crime before compelling disclosure of their identity. If the government cannot make such a showing, the subpoena must be quashed. Independently, if evidence in the record or in the public domain shows that the grand jury subpoena issued for an improper purpose, it must be quashed.

Dated: September 2, 2026      *<u>/s/ Laura Moraff</u>*

F. Mario Trujillo
Aaron Mackey
David Greene
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
mario@eff.org
amackey@eff.org
davidg@eff.org

Laura K. Follansbee
Michael Perloff
Scott Michelman
Arthur B. Spitzer
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF THE DISTRICT OF COLUMBIA
529 14th Street NW, Ste 420
Washington, D.C. 20045
(202) 457-0800
lfollansbee@acludc.org
mperloff@acludc.org
smichelman@acludc.org
aspitzer@acludc.org

Laura Moraff
Nathan Freed Wessler
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
lauramoraff@aclu.org
nwessler@aclu.org

Michael A. Petrino
CENTER FOR INDIVIDUAL RIGHTS
1100 Connecticut Ave., NW
Suite 625
Washington, DC 20036
(202) 833-8400
petrino@cir-usa.org

Matthew P. Cavedon
CATO INSTITUTE
1000 Mass. Ave., NW
Washington, DC 20001
(706) 309-2859,
mcavedon@cato.org

Ronald G. London
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE,
Ste. 340
Washington, DC 20003
(215) 717-3473
ronnie.london@fire.org

Cody Venzke
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th St. NW
Washington, DC 20005
(202) 715-0816
cvenzke@aclu.org

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits because, excluding those parts of the brief exempted under Federal Rule of Appellate Procedure 32(f), it contains 6,437 words. The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman) using Microsoft Word 365.

Dated: September 2, 2026 *<u>/s/ Laura Moraff</u>*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this second day of September, 2026, the foregoing brief of *Amici Curiae* American Civil Liberties Union, American Civil Liberties Union of the District of Columbia, Electronic Frontier Foundation, Center for Individual Rights, Foundation for Individual Rights and Expression, Cato Institute, and NetChoice was filed electronically through the Court's Box.com Repository for this matter. The undersigned will send this filing by e-mail to counsel for the parties.

Dated: September 2, 2026 *<u>/s/ Laura Moraff</u>*